# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

v.

MARK ALLAN PLUMMER, EMILIO
BARRERA, JR. (A/K/A MIKE BARRERA),
PRT CONSULTING, LLC D/B/A PETROLEUM
RESOURCES OF TEXAS, RICHMOND
ENGINEERING, INC., TODD J. PRINCE,
GEORGE RAUCH (F/K/A GEORGE B.
FASCIANO), and TODD STUART BREITLING,

Defendants.

C.A. No.:  3:21-cv-02331

Jury Trial Demanded

## COMPLAINT

Plaintiff Securities and Exchange Commission ("SEC") files this Complaint against

Defendants Mark Allan Plummer ("Plummer"), Emilio Barrera, Jr. (a/k/a Mike Barrera)

("Barrera"), PRT Consulting, LLC d/b/a Petroleum Resources of Texas ("Petroleum

Resources"), Richmond Engineering, Inc. ("Richmond Engineering"), Todd J. Prince ("Prince"),

George Rauch (f/k/a George B. Fasciano) ("Rauch"), and Todd Stuart Breitling ("Breitling"),

and alleges as follows:

## NATURE OF THE ACTION

1.      From approximately November 2018 through September 2020, Plummer and his

company (Richmond Engineering) and Barrera and his company (Petroleum Resources) engaged

in a scheme to defraud more than 70 investors out of over $7 million through unregistered and fraudulent securities offerings relating to two oil and gas well projects.

2.      Plummer is a securities fraud recidivist who has been sanctioned for prior misconduct.  In June 2019, the SEC filed a settled enforcement action against him arising from fraudulent securities offerings related to two oil and gas projects called the East Texas 2H and Salmon 2W.  Thereafter, Plummer continued to raise funds for two wells that were related to those projects - the Beeler 1H and Beeler 2H (collectively, the "Beeler Wells").

3.      But rather than sell directly to investors again, Plummer lurked behind the scenes and, through Richmond Engineering, agreed to sell interests in the Beeler Wells to Petroleum Resources, which is controlled by Barrera, one of Plummer's former salesmen.  Petroleum Resources, acting through Barrera and several salespeople, then marketed, offered, and sold securities to investors related to the Beeler Wells.

4.       Barrera and Petroleum Resources made multiple material misrepresentations and omissions to investors in connection with these offerings.  Barrera lied to investors about his credentials and his and Petroleum Resources' experience in the oil and gas industry.  Barrera also told investors that Petroleum Resources would manage the well projects, when, in truth and unbeknownst to investors, Plummer, the undisclosed recidivist, was actually doing so.  Further, instead of spending investor funds on the well projects as promised, Barrera misused and misappropriated investor funds, including to pay for his lavish lifestyle, to pay back earlier investors, and to divert funds to Plummer.

5.      While Plummer did not solicit investors directly, he played a critical role in the fraudulent scheme.  Plummer hosted a weekly radio show about oil and gas investing that generated most of the investments by referring potential investors to Petroleum Resources

without disclosing Plummer's hidden connection to the offerings.  Plummer also participated in drafting the offering materials and training the Petroleum Resources sales team.  In addition, Plummer knowingly misused and misappropriated investor funds for club memberships, student loans, personal credit card debt, car and mortgage payments, and other improper purposes.

6.      Prince, Rauch, and Breitling were the primary members of the Petroleum Resources sales team.  They and Barrera, none of whom were registered as brokers, offered and sold the securities at issue to investors and received undisclosed commissions, which were typically equal to approximately 10 percent of the amounts invested.

7.      As a result of their misconduct, Barrera, Petroleum Resources, Plummer, and Richmond Engineering violated, and unless enjoined will continue to violate, the antifraud provisions of the federal securities laws, specifically Barrera and Petroleum Resources violated Section 17(a) of the Securities Act of 1933 (the "Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, and Plummer and Richmond Engineering violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.  Barrera, Prince, Rauch, and Breitling violated, and unless enjoined will continue to violate, the broker-registration provisions of the federal securities laws, specifically, Section 15(a) of the Exchange Act, and Plummer aided and abetted those violations.

8.      The SEC brings this action seeking permanent injunctive relief, disgorgement of ill-gotten gains plus prejudgment interest, and civil penalties against all Defendants, and, additionally against Plummer and Barrera, officer and director bars and conduct-based injunctions.

**DEFENDANTS**

9.      Plummer is a natural person and a resident of Richardson, Texas.  At all relevant times, Plummer controlled Richmond Engineering.

10.     Barrera is a natural person and a resident of McKinney, Texas.  At all relevant times, Barrera controlled Petroleum Resources.

11.     Petroleum Resources is a Texas limited liability company formed on or about October 6, 2009, with its principal place of business in Richardson, Texas.

12.     Richmond Engineering is a Texas corporation formed on or about January 12, 2017, with its principal place of business in Richardson, Texas.

13.     Prince is a natural person and a resident of Plano, Texas.

14.     Rauch is a natural person and a resident of Dallas, Texas.

15.     Breitling is a natural person and a resident of Dallas, Texas.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d), 21(e), and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa(a)].  The units offered, purchased, and sold, as alleged herein, are investment contracts, and thus securities under Section 2(a)(1) of the Securities Act [15 U.S.C. § 77b] and Section 3(a)(10) of the Exchange Act [15 U.S.C. § 78c].  Defendants directly or indirectly made use of the means or instrumentalities of interstate commerce or the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

17.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  Certain of the

transactions, acts, practices, and courses of business constituting violations of the federal securities laws occurred within this District, including but not limited to, offers and sales to investors.  One or more of the Defendants also reside in this District.

## FACTUAL ALLEGATIONS

### A.  Background.

18.     Plummer is a licensed petroleum engineer who has been involved in a series of failed companies and investments related to oil and gas ventures.  Plummer is the President and owner of Richmond Engineering.  Richmond Engineering owns oil and gas interests, and it also facilitates and obtains airtime for Plummer's oil and gas radio show and radio advertisements, which are discussed below.

19.     Effective January 30, 2017, the Financial Industry Regulatory Authority ("FINRA") permanently barred Plummer from associating with any FINRA member firm in any capacity for, among other things, misusing investor funds and providing false and misleading testimony during a FINRA investigation.  FINRA also ordered Plummer to pay a penalty of $75,000, and expelled a broker-dealer owned by Plummer.

20.      On June 26, 2019, the SEC filed *SEC v. Mark Allan Plummer*, No. 3:19-cv-01538-G (N.D. Tex.), alleging that Plummer disseminated false and misleading offering materials and misappropriated investor funds in connection with a securities offering relating to the East Texas 2H and Salmon 2W oil and gas projects, which also sought to raise funds related to the wells at issue in this matter.  Plummer agreed to a final judgment permanently enjoining him from violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and Section 17(a) of the Securities Act, and requiring him to pay disgorgement of $399,011, prejudgment interest of $33,008, and a $75,000 civil penalty.

5

21.     Barrera is a long-time oil-and-gas salesperson who was previously associated with multiple broker-dealers, including two oil and gas-related firms controlled by Plummer.  Barrera is the President, Managing Member, and owner of Petroleum Resources, which Barrera used to acquire and offer interests in oil and gas wells.  Barrera has a criminal record.  On or about June 2014, Barrera was indicted and later pleaded *nolo contendere* to a second degree felony charge of aggravated assault with a deadly weapon, and he was on house arrest during a portion of the period that he was conducting the offerings at issue.

22.     Prince, Rauch, and Breitling (collectively, the "Salespeople") are all former salespeople for Petroleum Resources.  Each of the Salespeople had previous experience in the oil and gas industry.  Prince has been involved in the oil and gas industry for over 17 years, including work as a salesperson and operations executive.  From approximately June 2020 through September 2020, Prince also served as Petroleum Resources' Vice President of Operations.  Rauch has been involved in the oil and gas industry for approximately 15 years, including working previously with Barrera at another oil and gas company, and he is now the Investor Relations Manager at a company offering oil and gas investments.  Breitling previously worked with Barrera at another oil and gas company and has past sales experience in the industry.

23.     On June 17, 2020, the Texas State Securities Board ("TSSB") entered an emergency cease and desist order, *In the Matter of PRT Consulting, LLC, et al.*, Order No. ENF-20-CDO-1810 (Tex. State Sec. Board, June 17, 2020), against Plummer, Barrera, Petroleum Resources, Richmond Engineering, Prince, and others in connection with an investigation related to the Beeler 2H offering at issue in this enforcement action.

6

**B. Plummer Repackages the Beeler Wells for Barrera.**

24.     On or about July 25, 2018, and while the SEC's investigation resulting in the earlier enforcement action against Plummer was still ongoing, Plummer, through Richmond Engineering, purchased leases and interests related to the East Texas 2H and Salmon 2W well projects at issue in the SEC's 2019 enforcement action against Plummer from one of his other companies, Texas E&P Operating, Inc., which was in bankruptcy.  This included leases and interests in the Beeler Wells.

25.      In or around December 2017, after working as a salesperson for two of Plummer's now defunct oil and gas companies, Barrera acquired Petroleum Resources to use as a vehicle to raise money for oil and gas projects.  Barrera owns Petroleum Resources and is its President and Managing Member.

26.     In or around July 2018, Barrera reconnected with Plummer.  Petroleum Resources agreed to purchase from Richmond Engineering a portion of the working interests in the wellbores for the Beeler Wells.  A wellbore is the hole that is drilled for a specific well.  A wellbore working interest conveys an interest in the specific well for which that wellbore was drilled.

27.     The agreement between Richmond Engineering and Petroleum Resources was memorialized in two Wellbore Completion Participation Agreements – one for each of the Beeler Wells (collectively, the "Participation Agreements").  The Participation Agreements state that they were entered into to be effective November 1, 2018 and November 1, 2019, for the Beeler 1H and Beeler 2H wells, respectively.  Though dealing with separate wells, the Participation Agreements followed the same template and contained similar core terms:

- Richmond Engineering or its designee had the sole right and responsibility to

select the operator for the Beeler Wells;

- Richmond Engineering agreed to sell working interests in the wellbore to Petroleum Resources at the following prices, and would provide, when appropriate, a wellbore-only assignment:

  - Beeler 1H - $36,000 per one percent working interest.

  - Beeler 2H - $105,000 per one percent working interest.

- Petroleum Resources would acquire up to 75 percent of the working interests while Richmond Engineering or its industry partners would retain 25 percent of the working interests.

**C. The Beeler 1H and 2H Offerings.**

28.     To fund its purchase from Richmond Engineering of the working interests in the Beeler Wells, Petroleum Resources conducted unregistered offerings to sell units of joint venture interests ("Units") in two purported joint ventures, one for each well – the Beeler 1H Joint Venture and the Beeler 2H Joint Venture.  Petroleum Resources purportedly served as the Managing Venturer for both the Beeler 1H and the Beeler 2H Joint Ventures.

29.     The Beeler 1H Joint Venture claims to be a joint venture whose objective is to complete and produce one horizontal well (the Beeler 1H) to develop the Subclarksville Sand in the Elkhart Field in Anderson County, Texas.  The Beeler 1H offering brochure states that the offering was making 75 Units available to investors at a cost of $48,000 per unit.

30.     The Beeler 2H Joint Venture claims to be a joint venture dedicated to drilling a horizontal oil well (the Beeler 2H) to develop the Subclarksville Sand in the Elkhart Field in Anderson County, Texas, and whose location would offset the Beeler 1H well.  The Beeler 2H

offering brochure states that the offering was making 58 Units available to investors at a cost of $140,000 per unit.

31.    The offerings for both the Beeler 1H and 2H Units were conducted in multiple states using, among other things, telephone solicitations and written offering materials.  For the Beeler 1H Joint Venture, Petroleum Resources provided investors a short brochure.  For the Beeler 2H Joint Venture, Petroleum Resources provided investors a similar brochure and a lengthy Confidential Information Memorandum ("CIM").  Barrera reviewed, participated in drafting, authorized, and approved the brochures and CIM before they were provided to investors.  Barrera, who owns and controls Petroleum Resources and is its President and Managing Member, had final approval and authority over the offering materials and any other documents and internet postings issued by the company.

32.    Petroleum Resources used in-house salespeople to raise funds for the offerings, including the Salespeople.  Barrera also supervised salespeople and personally solicited investors and advised them on the merits of the investment.

33.    Petroleum Resources and Richmond Engineering shared the same office space in Richardson, Texas, during a significant portion of the period when the offerings were conducted.

34.    Plummer and Richmond Engineering were the source for nearly all of Petroleum Resources' investors.  Plummer hosted the Smart Oil and Gas radio show (the "Radio Show") and related radio advertisements.  The Radio Show aired weekly from at least approximately August 2018 to August 2020, on a broadcast radio station serving the Dallas, Texas area, but the show and advertisements also aired nationwide during this period via various online and/or satellite platforms.  The radio shows were also posted on Smart Oil and Gas's website, which Richmond Engineering controlled.

9

35.     As part of the Radio Show, Plummer touted the benefits of oil and gas investments without discussing any specific entity or offering.  However, listeners were encouraged to call into the show to get more information.  When interested listeners contacted the phone number provided on the Radio Show, they were routed to Petroleum Resources and its sales team, who were marketing the offerings.  Plummer did not tell listeners about his connection to the offerings or Petroleum Resources, other than to mention that Petroleum Resources sponsored the Radio Show.

36.     When a Petroleum Resources salesperson took a call, the salesperson would typically outline the investment opportunity in the Beeler 1H Joint Venture or Beeler 2H Joint Venture.  Thereafter, the salesperson would have Petroleum Resources send out investment packets to the potential investor and direct the investor to send funds by check or wire.  The packet would typically include the brochure, subscription documents, conversion table, wiring instructions, and, for the Beeler 2H Joint Venture, the CIM.

37.     If the investor invested (sending in completed subscription documents and investment funds), the primary salesperson who spoke with the investor and discussed the offering would typically receive an undisclosed commission equal to approximately 10% of the funds invested.

38.     Between approximately December 2018 and November 2020, Petroleum Resources raised over $7 million from over 70 investors in approximately 15 states from the sale of the Units:

| **Offering** | **Approx. Period Funds Received** | **Approx. Funds Raised** |
|---|---|---|
| Beeler 1H | Dec. 2018 – Sept. 2020 | $2.9 million |
| Beeler 2H | Nov. 2019 – Nov. 2020 | $3.7 million |
| Beeler 1H or 2H[1] | Jan. 2019 – Sept. 2020 | $1.3 million |
| Investor Refunds | | ($0.5 million) |
| | | **$7.4 million** |

**D. The Units are Securities.**

39.     In an effort to evade federal securities regulations, Petroleum Resources labeled the securities offerings "joint ventures," and had investors sign documents purporting to disclaim that the investments were securities.  But in fact, the Units were investment contracts, and thus securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act. Investors in the offerings made an investment of money, in a common enterprise, with an expectation of profits to be derived solely from the efforts of others.

40.     The investors purchased their Units with cash by check or wire.  The investment funds were used to purchase interests in a common venture – the Beeler 1H Joint Venture or the Beeler 2H Joint Venture – and were commingled.  And, from the outset of the investment, the investors expected to receive profits based solely on the efforts and expertise of Barrera and Petroleum Resources or other third parties properly retained by them.

41.     Petroleum Resources offered and sold the Units nationwide to the general public, attracting investors by sponsoring radio broadcasts that generated leads for its sales staff who pitched investors in multiple states.  Petroleum Resources did not limit offerees to those with expertise or experience in oil and gas well projects.  In fact, most of the investors who purchased

---

[1] To date, the SEC's staff has been unable to segregate approximately $1.3 million of the funds raised between the Beeler 1H and Beeler 2H offerings as a result of the extensive commingling of investor funds within and between the relevant accounts, and Petroleum Resources' failure to maintain and produce adequate books and records.

Units in the Beeler 1H Joint Venture and the Beeler 2H Joint Venture were not experienced or knowledgeable about how to manage or develop an oil and gas well project.

42.     The investors in the Beeler 1H Joint Venture executed subscription documents that designated Petroleum Resources as the Managing Venturer.  Upon information and belief, there was no written joint venture agreement granting specific powers in the venture to the investors, and Petroleum Resources exercised control over the management of the venture.

43.     The investors in the Beeler 2H Joint Venture did execute a joint venture agreement.  The agreement, however, designates Petroleum Resources as the Managing Venturer and explicitly delegates the day-to-day management of the operations of the venture to Petroleum Resources.  The agreement further vests Petroleum Resources with broad ranging additional powers, including the power:  to retain or act as operator; to cause the operator to drill, complete, equip, test, rework, operate, plug, and abandon the well; to execute contracts; take and hold title to property; and to utilize funds.  The agreement also expressly states that investors do not have the power to act on behalf of the venture with respect to any operations of the venture.

44.     The fortunes of the investors in both the Beeler 1H and Beeler 2H Joint Ventures were entirely dependent on the entrepreneurial and managerial ability of Barrera and Petroleum Resources (and unbeknownst to the investors, Plummer and Richmond Engineering).  Although Petroleum Resources labeled the offerings as joint ventures, this is not how the investments actually operated.  In reality, the investors were passive investors in investment contracts.

45.     Petroleum Resources, not the investors, made the efforts critical to the success of the enterprise.  Petroleum Resources set the offering terms before the investors invested, including installing itself as Managing Venturer, choosing the wells, and setting the turnkey drilling price.  Petroleum Resources managed the operations of the ventures, and, without the

12

investors' knowledge or input, entered into an undisclosed agreement with Richmond Engineering to perform activities critical to the success of the well projects. Petroleum Resources also controlled the ventures' assets and exercised control over and disbursed the invested funds in a manner not disclosed in the offering documents, including to Richmond Engineering, without the investors' knowledge or input.

46.     The investors were numerous, geographically dispersed, and, upon information and belief, most or all: had no prior relationship to one another, did not communicate with one another directly; did not meaningfully participate in managing the venture or developing the well projects; and had no access to information about the well projects except through updates provided by Petroleum Resources.

**E.  Barrera and Petroleum Resources Defrauded Investors.**

### 1.     The CIM was false and misleading.

47.     The CIM for the Beeler 2H Joint Venture, which was used at least until approximately mid-August 2020,[2] contains misrepresentations and omissions about the use of investor funds, Barrera's and Petroleum Resources' credentials, and Barrera's and Petroleum Resources' roles and duties in the venture.

### i.     Misuse of investor funds.

48.     Pursuant to the CIM, Petroleum Resources was raising investor funds to cover the drilling of one well "to the agreed depth and the completion testing of a single zone . . . including the setting of production casing and, if necessary, plugging and abandoning a dry hole . . ."

---

[2] Following the TSSB's entry of the emergency cease and desist order on June 17, 2020, Petroleum Resources created a revised CIM, dated August 10, 2020, that disclosed the TSSB order among other revisions.  To the extent the revised CIM was utilized, it remained materially misleading in numerous respects and, upon information and belief, only approximately 4 of the individuals who invested in the Beeler 2H Joint Venture during the period alleged herein purchased Units after August 10, 2020.

49.     The CIM includes an Estimated Application of Proceeds that represents that

100% of the investor funds would go toward the Turnkey Drilling and Completion Price:

| ESTIMATED APPLICATION OF PROCEEDS [1][2] | | |
|---|---|---|
| | % | Total |
| Turnkey Drilling and Completion Price | 100% | $8,202,020.20 |
| Organizational Expenses [3] | | |
| Management Fee (one-time fee) [3][4] | | |
| **TOTALS** | **100.00%** | **$8,202,020.20** |

(1)     Assumes all Units are subscribed.
(2)     See "PROPOSED ACTIVITIES."
(3)     These amounts are included in the Turnkey Drilling and Completion Price.
(4)     Amount equal to the excess, if any, of the Turnkey Drilling and Completion Price over the actual cost of operations.

50.     The Turnkey Drilling and Completion Price is defined as "the price to be paid by

the Joint Venture to [Petroleum Resources] to perform the drilling, completion and testing of the

Well under the Turnkey Drilling and Completion Contract."  The CIM acknowledges that,

"[u]pon initial capitalization, funds are expected to only be sufficient to drill and develop the

Prospect Well."

51.     The CIM further represents that investor proceeds would be deposited in a

segregated account during the offering's capitalization period, and that "[a]ll drilling and

completion costs shall be paid from the segregated account."  The CIM further promises

investors that "[t]here will be no commingling of funds between the Venture and [Petroleum

Resources] or any of its Affiliates thereof."

52.     The CIM also represents that "[n]o officer, director or employee of [Petroleum

Resources] will receive any direct remuneration or other compensation from the Joint Venture."

53.     Contrary to representations in the CIM, Barrera commingled investor funds in a

general Petroleum Resources bank account, including investor funds that were initially deposited

in an account for the Beeler 2H Joint Venture account but then transferred to the Petroleum

14

Resources general account and other investor funds that were deposited directly into the Petroleum Resources account. Further, Barrera misused investor funds to, among other things, pay his bail bonds, pay personal bills and expenses, fund various shopping sprees, pay undisclosed commissions, and pay back earlier investors who requested refunds.

54.     Petroleum Resources also diverted approximately $2.4 million of investor funds to Richmond Engineering, the majority of which originated from Beeler 2H investors. Plummer misused a significant portion of these funds on personal expenses and other matters unrelated to the Beeler Wells. The CIM did not disclose that Petroleum Resources would transfer any money to Plummer or Richmond Engineering, and Petroleum Resources did not track or control how Plummer used investor funds.

55.     Barrera helped prepare and authorized the CIM, and he therefore knew that he was using investor funds for improper purposes, or, at a minimum, was severely reckless in using investor funds in a manner the CIM did not authorize or disclose. Barrera's scienter is imputed to Petroleum Engineering, an entity he controls.

### ii.     The CIM misrepresented Barrera's and Petroleum Resources' credentials.

56.     The CIM provides a detailed biography for Barrera:

Mr. Mike Barrera, a native Texan and third generation oilman, is the President and Chief Executive Officer of Petroleum Resources of Texas. He is a graduate of West Texas A&M University, majoring in Computer Science with a minor in Business. Quickly becoming a supervisor early in his career in the financial and information technology sector with State Farm Insurance, he developed leadership skills and business acumen that prepared him for the fast-paced, competitive oil and gas industry. Mr. Barrera has been a leader in the growth of oil and gas private equity management firms since 2004 and he continues to serve the needs of the oil and gas investment community across the United States. Mr. Barrera continues to be an influential industry leader, focusing on investment opportunities that have the potential to generate successful results for his investors.

57.     The biography contains a host of false statements and omissions. Barrera never

graduated high school and never attended college, so the representations related to his education at West Texas A&M University are false. Barrera also exaggerated his work experience. Although he did work in State Farm's IT department, he was not a supervisor in the company's "financial sector." In addition, the statements describing his leadership in the oil and gas industry were also an exaggeration. Barrera was a longtime salesperson; not a leader in the growth of oil and gas private equity management firms. And while Barrera is described as a "third generation oilman," two family members (grandfather and great-grandfather) were oilfield workers, but neither owned their own companies or held significant leadership positions.

58.    After choosing to disclose information about Barrera's background and purported education and work experience, the CIM failed to disclose Barrera's criminal, regulatory, and litigation history. In particular, Barrera was on felony probation while raising investor funds and was later placed on house arrest, part of which was served while the offerings were ongoing. The CIM also failed to disclose that a former investor sued Barrera and Petroleum Resources in December 2019 for securities fraud. Further, Barrera continued the offering even after the TSSB entered an Emergency Cease and Desist Order against him, Petroleum Resources, Plummer, Richmond Engineering, and others relating to the Beeler Wells.

59.    The Petroleum Resources website, which was accessible to investors throughout the time the offerings were ongoing, similarly overstated the company's credentials and track record. Petroleum Resources falsely claimed it had a "long successful track record" dating back to its founding in 2009, and that it had a geological team with over "100 years of experience and expertise in all aspects of the oil and gas industry, from engineering, geology, drilling and operating financially productive oil wells for our industry and investment partnerships." Petroleum Resources also falsely claimed it prided itself on "successfully specializing in only

developing highly productive oil and gas fields that gives us and our investment partners the ability to make multiple returns on our investments." In truth, there was no Petroleum Resources geological team, and it had no experience drilling or operating oil and gas wells.

60.    Barrera had personal knowledge of his own and his company's background, credentials, and criminal and litigation history, and he therefore knew that the representations and omissions to investors on these topics in the CIM and on Petroleum Resources' website were false and misleading.

> ### iii.    The CIM misrepresented Petroleum Resources' role and concealed Plummer's and Richmond Engineering's roles.

61.    The CIM for the Beeler 2H Joint Venture identified Petroleum Resources as the Managing Venturer responsible for the day-to-day operations of the Beeler 2H Joint Venture. Among other tasks, as set forth in the Joint Venture Agreement attached to the CIM, Petroleum Resources would:

> a.    Investigate . . . gas and mineral properties;
>
> b.    Retain or act as operator(s), including an affiliate . . . to drill, complete, equip, test, rework, plug and abandon the Well;
>
> c.    Conduct seismographic surveys . . . and services;
>
> d.    Make all elections or decisions . . . that may be necessary or permissible in connection with any . . . agreement . . .; and
>
> e.    Execute operating agreements.

62.    The CIM also represented that Petroleum Resources would enter into a Turnkey Drilling and Completion Contract (the "Turnkey Contract") with the Beeler 2H Joint Venture once it was capitalized and commenced operations. Under the Turnkey Contract, Petroleum Resources would, among other things:

> a.    Engage the operator to drill, complete, and test the well;

17

b.      Furnish equipment and labor, and perform services as set forth in the Turnkey Contract;

c.      Determine, in its sole discretion, all technical aspects of the initial drilling, Completion, and testing of the well; and

d.      Make a one-time, good faith and reasonable attempt to successfully complete a zone of interest in the well.

63.     The Turnkey Contract also provided that Petroleum Resources would conduct all its efforts in a "good and workmanlike manner and with reasonable due diligence" and would "cause any third-party to conduct its efforts in a good and workmanlike manner and with reasonable due diligence."

64.     But Petroleum Engineering never executed the Turnkey Contract with the Beeler 2H Joint Venture, and Petroleum Resources never planned to serve as or select an operator or have any control over the drilling and operations of the Beeler Wells.  Even if it had, Petroleum Resources was incapable of performing the duties listed in the CIM, Joint Venture Agreement, and Turnkey Contact.  Barrera and Petroleum Resources had no drilling, engineering, or operating experience; instead, their actual role was to raise investor funds.

65.     In fact, investors were (unknowingly) dependent on Plummer and Richmond to perform the operational duties contemplated by the oil and gas ventures and to make the substantive decisions related to the Beeler Wells.  Despite the critical roles of Plummer and Richmond Engineering, the CIM failed to disclose them.

66.     To the contrary, Barrera actively concealed from investors Plummer's and Richmond Engineering's involvement.  Barrera reformatted investor updates that Plummer drafted to make it appear as if Barrera drafted them.  In one instance, on or about July 18, 2020, Barrera mistakenly sent investors Plummer's original email along with Barrera's version.  When

one investor questioned Barrera about Plummer's role, Barrera responded the next day that

Plummer had a "tiny bit of interest [in one of the Beeler wells]" – which grossly misstated

Plummer's actual role.

67.     Unbeknownst to investors, by early 2020, Richmond Engineering and Petroleum

Resources had also become embroiled in a dispute over the amounts owed under the

Participation Agreements, which resulted in project delays and work not being performed on the

Beeler Wells.  None of this information was conveyed to investors.

68.     Barrera knew that the statements and omissions in the CIM about his and

Petroleum Resources' role in the project were false and misleading, or at a minimum, he was

severely reckless in making them.  Barrera has testified he knew from the beginning that

Plummer and Richmond Engineering were going to be the ones making all of the substantive

decisions as to the Beeler Wells.  The Participation Agreements that Barrera signed also made

clear that Richmond Engineering or its designee – not Petroleum Resources or the Beeler 1H and

Beeler 2H Joint Ventures – had the sole right to select the operator for the Beeler Wells.

**2.     The offering brochures were also false and misleading.**

69.     The brochures for the Beeler 1H Joint Venture and the Beeler 2H Joint Venture

also contained false and misleading statements about Petroleum Resources' role with the Beeler

Wells.  Beeler 1H brochure's "project summary" falsely claims that Petroleum Resources

(referred to as "we" in the brochures) had acquired and inspected the well, found oil at the

surface, and expressed confidence that it could bring the well into production at oil rates higher

than the initial test rate.  The brochure also states that Petroleum Resources would perform work

on the well, and purchase and install various equipment.  The brochure further touted that "our

engineers are confident that the well could far exceed the original test rate and ultimately recover

19

up to 2,000,000 barrels of oil." Similarly, the Beeler 2H brochure falsely stated Petroleum Resources "identified key locations within our 7,400-acre leasehold," and referred to "our" modern engineering analysis, oil production analysis, and reservoir analysis.

70.     Contrary to the claims in the brochures, Petroleum Resources did not perform any of this work. In fact, Petroleum Resources does not employ any engineers and did not function as a driller or operator. Instead, and undisclosed to investors, to the extent any such work was done, or directed to be done, it was by Plummer and Richmond Engineering (or Plummer's former companies).

71.     Further, the brochures stated that the objective of the offerings was to complete and produce (Beeler 1H) and drill (Beeler 2H) a horizontal well and touted that investors may be able to deduct most of their investment against drilling costs and lease operating expenses. The brochures omitted that investor funds would in fact be used to, among other things, fund Barrera's lifestyle and personal expenses, pay undisclosed commissions, or divert funds to Plummer. Barrera's and Petroleum Resources failure to disclose in the brochures how the Beeler 1H Joint Venture and Beeler 2H Joint Venture investors' funds would actually be used was highly misleading.

### 3.     The misstatements and omissions were material.

72.     The misstatements and omissions in the written offering documents were material. A reasonable investor would want to know that: (1) Barrera commingled investor funds and used them for purposes other than the stated investment purposes; (2) Barrera lied about his and Petroleum Resources' credentials; (3) Barrera had a criminal record and was on house arrest while he and his company were selling the Units to investors; and (4) Barrera and Petroleum Resources had been sued for fraud and named in a TSSB emergency cease-and-desist

20

order.

73.     Barrera also actively concealed Plummer's and Richmond Engineering's role in the Beeler 1H and Beeler 2H Joint Ventures.  A reasonable investor would want to know that Plummer – who has a record of regulatory sanctions and previously settled an SEC lawsuit alleging that he misappropriated investor funds – was not only substantially involved with and critical to the success of their investment, but also receiving investor funds.

**F.  Plummer and Richmond Engineering Actively Participated in the Scheme.**

74.     Plummer and Richmond Engineering played an active and substantial role in the scheme to defraud investors.  Indeed, Barrera and Petroleum Resources depended on Plummer for almost every critical aspect of the scheme.

**1.  Plummer facilitated the fraudulent offering.**

75.     Plummer, through Richmond Engineering, agreed to sell to Petroleum Resources the working interests in the wellbores for the Beeler Wells, which formed the basis for the offerings.  Upon information and belief, Plummer concealed his role in the offerings and chose to work through Barrera as a front man instead of directly offering interests to investors as a result of his prior regulatory history.

76.     Plummer was directly involved in preparing the written offering materials, which he knew would be provided to investors.  Plummer, through Richmond Engineering, provided Barrera offering materials from his previous offerings to use as templates for the Beeler 1H and Beeler 2H offerings.  Plummer worked directly with Barrera, as well as an administrative support person ("admin") and a graphics firm, to revise these templates for use in the offerings at issue.  Plummer also reviewed the offering materials and provided input on their contents.

77.     For example, on or about October 4, 2019, Plummer spoke with the graphics firm that prepared offering materials for Plummer's earlier offerings and with the admin about what

21

he wanted included in the Beeler 2H offering brochure.  On October 4, 2019, the admin sent an email to the graphics firm copying Plummer and Barrera that attached the Beeler 1H brochure for use as a template and relayed changes to be made to that template for the Beeler 2H brochure.  On or about October 17, 2019, the admin met with Plummer to go over the draft of the Beeler 2H brochure and, later that day, the admin emailed a revised version of the brochure to the graphics firm (copying Plummer and Barrera) that included Plummer's hand written edits to the draft.  On October 18, 2019, the graphics firm sent an email to Barrera and Plummer with a link to the proposed final offering brochure for review, and Plummer responded by email that same day stating that the brochure "looks great!"  Similarly, Plummer received the CIM by email for review, including on October 22, 2019, and he provided his input to the CIM orally to the admin.  And on November 9, 2019, the admin emailed Plummer a proposed final version of the CIM to make sure all of his comments had been incorporated.

78.     Further, Plummer was the originating source for nearly all of the investors.  As alleged above, Plummer hosted the Radio Show and the radio advertisements.  Plummer agreed with Barrera that Petroleum Resources would sponsor the Radio Show.  Plummer's show and advertisements repeatedly encouraged listeners to call in to get more information about oil and gas investing.  By way of example, on June 1, 2019, listeners were told that the show had its senior team that came in every weekend to answer questions and that a live person would answer phone calls; and, on June 20, 2020, listeners were told that the show had its team available for calls just up the road from the studio.  As Plummer knew, investors that called the number provided during the show were routed to Petroleum Resources, which had a sales team conducting the offerings.

79.     Plummer also personally conducted training for the Petroleum Resources sales team.  In or about January and February 2020, Plummer led a series of in-person training sessions in Richardson, Texas, in which Plummer role-played different types of investors (e.g., doctor, engineer) and then critiqued the Petroleum Resources sales team's skills in attempting to close the sale.  During the training, Plummer also worked on improving the sales staff's phone etiquette and demeanor when speaking with potential investors.  In addition, Plummer helped the sales team understand the technical aspects of the wells so they could better explain and discuss the well investments.  Further, Plummer provided Petroleum Resources with sales script documents to help with their sales pitches.

80.     Additionally, Plummer drafted investor updates, which, as alleged above, Barrera re-formatted to conceal Plummer's involvement before sending to the Beeler 1H Joint Venture and Beeler 2H Joint Venture investors.

81.     Plummer helped prepare the written offering materials, and he therefore knew, or at a minimum was severely reckless in ignoring, that the offering materials misrepresented Barrera's and Petroleum Resources' true role in the Beeler Wells.  Further, Plummer knew that his Radio Show was referring investors to the offerings.  He has testified that he knew that investors calling into the Radio Show would be routed to Petroleum Resources, he communicated by email with one or more of the Salespeople about leads generated by the Radio Show, and he held training sessions with and critiqued the Petroleum Resources' sales team.  Plummer also knew that he did not disclose his connection to the offerings to investors on the Radio Show or otherwise, and knew, or at a minimum was severely reckless in ignoring, that his and Richmond Engineering's connection to the offerings was not disclosed to investors in the offering materials.

23

82.     As alleged above, a reasonable investor would consider that Barrera and Petroleum Resources were overstating their credentials and role in the ventures important in deciding whether to invest.  In light of his regulatory history, a reasonable investor would also consider the fact that Plummer was substantially involved with and critical to the success of their investment important in deciding whether to invest in the offerings.

## 2.  Plummer misused and misappropriated investor funds.

83.     Plummer used Richmond Engineering's bank accounts as a device to misuse and misappropriate investor funds.  Upon information and belief, Plummer or persons working at his direction provided the account information and authorizations necessary for Petroleum Resources to transfer investor funds to the Richmond Engineering accounts.  Petroleum Resources then transferred approximately $2.4 million of investor funds to Richmond Engineering in a series of over 30 transfers that began on or about May 1, 2019, and continued as late as approximately March 26, 2021.  Neither the CIM nor the brochures disclosed the transfers of investor funds to Plummer or Richmond Engineering.

84.     After Petroleum Resources improperly transferred investor funds to the Richmond Engineering accounts, those funds were commingled with other funds.  Plummer, as a signatory on the Richmond Engineering bank accounts, then spent a significant portion of the investor funds on personal expenses, such as club memberships, student loans, personal credit card debt, car and mortgage payments, legal fees, and other improper purposes that were also not disclosed in the offering materials.  The improper expenditures continued until at least November 2019.

85.     Each of the transfers of investor funds that Plummer accepted into the Richmond Engineering accounts, and each of the transfers and expenditures of investor funds that he caused to be made out of those accounts, was a deceptive act that Plummer committed in furtherance of

the scheme to defraud investors.

86.     The improper transfers enabled Plummer to obtain investor funds for his personal benefit.  Plummer was able to obtain these funds, because he caused Richmond Engineering to sell the working interests to Petroleum Resources, assisted Barrera in developing the offering documents, brought investors to the offering using his Radio Show, and then misused and misappropriated investor funds.

87.     Plummer helped prepare the offering materials, and therefore knew, or was severely reckless in not knowing, that they did not disclose the transfer of investor funds to Richmond Engineering.  For the same reason, Plummer knew, or was severely reckless in not knowing, that his use of investor funds for personal expenses was improper.  Plummer further knew that Petroleum Resources continued to raise funds from new investors after the misuse of earlier investor funds, and that these new investor funds would be misused as well, including because investor funds moved in and out of the Richmond Engineering accounts during the offerings, and Plummer continued to receive new payments for working interests following sales of Units to investors.

88.     Plummer's scienter is imputed to Richmond Engineering, an entity he controls.

89.     A reasonable investor would consider the fact that the offering proceeds would not be used for the represented investment purpose important in deciding whether to invest in the offerings.

**G. The Salespeople and Barrera Acted as Unregistered Brokers.**

90.     The Salespeople and Barrera acted as unregistered brokers in the offer and sale of the Units, which are securities.  They each engaged in the business of soliciting and effectuating the purchase and sale of the Units in exchange for transaction-based compensation, including

25

sales commissions.

91.    Barrera has a long history as a salesperson for other companies offering oil and gas investments, and he was previously associated with and sold securities for Plummer's former companies.  As alleged above, Prince, Rauch, and Breitling also have past experience selling oil and gas investments.

92.    The Salespeople and Barrera each solicited and sold Units to individuals in multiple states, including prospective investors who contacted the Petroleum Resources' sales team after listening to the Radio Show.  The Salespeople and Barrera provided investors with materials relating to the offering, advised them on the merits of the investments, and closed sales. They routinely provided investors and prospective investors with information about the Beeler Wells offerings.  Separately, Barrera also helped the Salespeople close sales, provided investor updates, and had control over the handling of investor funds.

93.    The Salespeople and Barrera each sold Units to numerous investors, and they each received sales-related compensation, including transaction-based compensation in the form of commissions from their respective sales.  The commissions were typically equal to approximately 10 percent of the amounts invested.  The offering materials did not disclose that commissions or other sales compensation would be paid.

94.    The Salespeople and Barrera were not registered as brokers or associated with a registered broker-dealer during any of the relevant period of misconduct.  Furthermore, they do not qualify for exemptions or safe harbors from the broker-dealer registration requirements.

95.    Plummer provided substantial assistance to the Salespeople and Barrera in their offer and sale of the Units.  Plummer had extensive experience offering and selling oil and gas investments and previously operated his own broker-dealer.  Plummer shared his expertise by

providing Petroleum Resources with sales script materials and leading sales training sessions for the Salespeople to assist them in making their investor pitches.  Plummer also provided Barrera with offering templates, and participated in drafting and editing the offering materials.  Plummer also generated almost all of the investors through his Radio Show referrals, and those funds were the source of the funds Petroleum Resources paid to Richmond Engineering.

### FIRST CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**
**(against Barrera and Petroleum Resources)**

96.     The SEC incorporates by reference each and every allegation contained in the paragraphs above.

97.     By engaging in the acts and conduct alleged herein, Barrera and Petroleum Resources, directly or indirectly, singly or in concert with others, by the use of the means or instrumentalities of interstate commerce and/or or by use of the mails, in connection with the purchase or sale of securities: (a) employed a device, scheme, or artifice to defraud; and/or (b) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

98.     Barrera and Petroleum Resources engaged in this conduct knowingly or with severe recklessness.

99.     By reason of the foregoing, Barrera and Petroleum Resources violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder
### (against Plummer and Richmond Engineering)

100.     The SEC incorporates by reference each and every allegation contained in the paragraphs above.

101.     By engaging in the acts and conduct alleged herein, Plummer and Richmond Engineering, directly or indirectly, singly or in concert with others, by the use of the means or instrumentalities of interstate commerce and/or or by use of the mails, in connection with the purchase or sale of securities: (a) employed a device, scheme, or artifice to defraud; and/or (c) engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

102.     Plummer and Richmond Engineering engaged in this conduct knowingly or with severe recklessness.

103.     By reason of the foregoing, Plummer and Richmond Engineering violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. §§ 240.10b-5(a) and (c)].

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (against Barrera and Petroleum Resources)

104.     The SEC incorporates by reference each and every allegation contained in the paragraphs above.

105.     By engaging in the acts and conduct alleged herein, Barrera and Petroleum Resources, directly or indirectly, singly or in concert with others, in the offer or sale of securities, by use of the means and instrumentalities of interstate commerce and/or by use of the mails have: (a) employed a device, scheme, or artifice to defraud; and/or (b) obtained money or property by

means of an untrue statement of a material fact or omitted to state a material fact necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading; and/or (c) engaged in a transaction, practice, or course of business which

operates or would operate as a fraud and deceit upon the purchaser.

106.     With regard to the violations of Section 17(a)(1) of the Securities Act, Barrera and

Petroleum Resources engaged in the conduct knowingly or with severe recklessness.  With

regard to the violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, they acted at least

negligently.

107.     By reason of the foregoing, Barrera and Petroleum Resources have violated, and

unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### FOURTH CLAIM FOR RELIEF

**Violations of Sections 17(a)(1) and (3) of the Securities Act**
**(against Plummer and Richmond Engineering)**

108.     The SEC incorporates by reference each and every allegation contained in the

paragraphs above.

109.     By engaging in the acts and conduct alleged herein, Plummer and Richmond

Engineering, directly or indirectly, singly or in concert with others, in the offer or sale of

securities, by use of the means and instrumentalities of interstate commerce and/or by use of the

mails have: (a) employed a device, scheme, or artifice to defraud; and/or (b) engaged in a

transaction, practice, or course of business which operates or would operate as a fraud and deceit

upon the purchaser.

110.     With regard to the violations of Section 17(a)(1) of the Securities Act, Plummer

and Richmond Engineering engaged in the conduct knowingly or with severe recklessness.  With

regard to the violations of Section 17(a)(3) of the Securities Act, they acted at least negligently.

111.    By reason of the foregoing, Plummer and Richmond Engineering have violated, and unless enjoined will continue to violate, Sections 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## FIFTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act
### (against Barrera, Prince, Rauch, and Breitling)

112.    The SEC incorporates by reference each and every allegation contained in the paragraphs above.

113.    By engaging in the conduct alleged above, Barrera, Prince, Rauch, and Breitling each acted as brokers within the meaning of Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(4)].

114.    Barrera, Prince, Rauch, and Breitling, while engaged in the business of effecting transactions in securities for the account of others, made use of the mails or the means or instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, a security without being registered with, or an associated person of a firm registered with, the SEC in accordance with Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

115.    Barrera, Prince, Rauch, and Breitling violated, and unless restrained and enjoined will continue to violate, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)]

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 15(a) of the Exchange Act
### (against Plummer)

116.    The SEC incorporates by reference each and every allegation contained in the paragraphs above.

117.     By engaging in the conduct alleged above, Plummer knowingly or recklessly provided substantial assistance to Barrera's, Prince's, Rauch's, and Breitling's violations of Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

118.     By reason of the foregoing, pursuant to Section 20(e) of the Exchange Act, Plummer aided and abetted Barrera's, Prince's, Rauch's, and Breitling's violations of, and unless restrained and enjoined will continue to aid and abet violations of, Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## RELIEF REQUESTED

WHEREFORE, the SEC respectfully requests that the Court:

(a)     Permanently enjoin Barrera, Petroleum Resources, Plummer, and Richmond Engineering from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

(b)     Permanently enjoin Barrera, Plummer, Prince, Rauch, and Breitling from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)];

(c)     Order Barrera and Petroleum Resources to disgorge, on a joint and several basis, all ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

(d)     Order Plummer and Richmond Engineering to disgorge, on a joint and several basis, all ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

(e)     Order Prince, Rauch, and Breitling to disgorge all of their ill-gotten gains as a result of the violations alleged herein, plus prejudgment interest on those amounts;

(f)       Impose civil penalties against Barrera, Petroleum Resources, Plummer, and

Richmond Engineering pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal

securities laws as alleged herein;

(g)       Impose civil penalties against Prince, Rauch, and Breitling pursuant to Section

21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws

as alleged herein;

(h)       Impose injunctions that restrain and enjoin Barrera and Plummer from directly or

indirectly, including, but not limited to, through any entity owned or controlled by them,

participating in the issuance, purchase, offer, or sale of any securities provided, however, that

such injunctions shall not prevent Barrera and Plummer from purchasing securities listed on a

national securities exchange for their own personal accounts;

(i)       Impose bars against Barrera and Plummer from acting as an officer or director of

a public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

(j)       Grant such other and further relief as the Court may deem just and proper.

Dated: September 30, 2021                    Respectfully submitted,

                                             */s/ Keefe M. Bernstein*
                                             Jennifer D. Reece
                                             Texas Bar No. 00796242
                                             Keefe M. Bernstein
                                             Texas Bar No. 24006839
                                             James E. Etri
                                             Texas Bar No. 24002061
                                             Securities and Exchange Commission
                                             801 Cherry Street, Suite 1900
                                             Fort Worth, Texas 76102
                                             (817) 978-6442 (JDR phone)
                                             (817) 900-2607 (KMB phone)
                                             (817) 978-4927 (facsimile)
                                             reecej@sec.gov
                                             bernsteink@sec.gov

                                             Counsel for Plaintiff
                                             Securities and Exchange Commission